Good morning. Thanks for being here counsel. We're here to handle a case that was put on delay because of some terrible weather events out in California. I hope everything has resolved itself out there for you Mr. Denver. Thank you. We'll ask you to come forward and call this first case, Germinano et al. v. Fidelity National Title Insurance Company. Good morning your honors. Michael Denver for the Germinano appellants. I'd like to reserve five minutes for my rebuttal. May it please the court, I'd like to limit my comments this morning as I've been answering your questions to one point. First, an internal conflict in the trial court ruling which has been magnified by a very recent decision of this court. Among other things, the trial court ruled, number one, that the nine and a half month Ponzi scheme by itself could never satisfy continuity no matter how many thousands were deceived. And number two, that America's practice of investing exchange funds for its own account for six years did not count toward continuity because land America was entitled to do whatever it wanted with exchange funds. So what did we say recently that makes you think that the district court got that wrong? Well, the case that I'm referring to is the February 2018 case of Liberty Bell Bank v. Rogers which outlined the analysis to be applied for continuity which is where you have one pattern of racketeering that arises out of another pattern of racketeering. You combine them both together to compute continuity. Where did you allege in the Second Amendment complaint two different patterns of racketeering activity? I read in the Second Amendment complaint and as you acknowledge in your opening brief it appears the focus is intensely and appears to be solely on the period of time from February 2008 until November, an eight and a half month period during which the ARS market was frozen. Where do we get a second set of things going on as we read your complaint? Well, I can cite you two paragraphs as I did in the papers but I think to answer your question what I would say is this. I don't think we have two distinct patterns of racketeering that are unrelated or separate. What we have here is a pattern of racketeering in the Ponzi scheme that actually injured my clients which arose out of the six years of prior investments which was addressed multiple times in the complaint. We have to look in your complaint, not in your briefing, in your complaint to find what is actually alleged. When you say you can cite us to things, that's what I'm looking for. Tell us where in the complaint do you say something about a scheme, a pattern of racketeering activity existing outside that frame which was chosen in the complaint? In fact, paragraph 158 of your complaint that begins the section entitled Pattern of Racketeering expressly indicates that the pattern was between February 11, 2008 and November 26, 2008. I'm looking at the paragraph right now and I have studied your complaint so I know you've made references to the actions in the six years prior to that but I'm not sure that I read anything that would amount to an allegation that that was a separate pattern of racketeering or a separate scheme. What I would say is this, that when measuring challenges to a complaint, we look at the factual allegations of the complaint, not the conclusory statements or argument. The factual allegations of the complaint encompass primarily the nine and a half month Ponzi scheme but also the six years of deception which led to the Ponzi. All of those factual allegations are incorporated into the RICO claim. Yes, there are statements in the complaint that say certain factual allegations, primarily the nine and a half month Ponzi scheme, add up to a RICO violation but those conclusory statements or arguments are not what is considered when measuring the sufficiency of allegations in a complaint. Well, you've got the factual allegations other than what's specifically identified because that's the period of time that's specifically identified as the scheme. That's not a merely a legal conclusion. That appears to be a statement of your factual assertion about when the scheme occurred. Historically, it happened from this date to that date. Setting that aside for a moment, even looking at those statements about earlier events, how do they amount to an assertion of some illegal activity or racketeering kind of activity? Because when I looked at those statements you're talking about, they appear to provide some kind of background information. That this is the business, they invested in ARSs, those may have been imprudent investments. Where are we going to get from those that this is actually setting up predicate acts of fraud in the prior six years? Okay, so without going over it too much because I did try to cover it in the papers, but paragraph 54 states that contrary to the language in the exchange agreements, including plaintiffs, which required the money to remain on deposit in FDIC insured SunTrust accounts, Land America, with the knowledge of CLTIC and LTIC, which are the title insurers, invested exchange funds in a number of investment vehicles, including the auction rate securities. Okay, even if we accept that, that's great, thank you. That drives straight to the point I'm trying to get at. If we accepted that as completely true, you would have a contract claim. How do you have a RICO fraudulent criminal? Is it mail fraud or wire fraud? Okay, so let me answer that question, but point out first that the next two recitations in the complaint, specifically paragraph 59 and 134, among a couple others, say that the acts during the six-year period of investing in the exchange funds were done for the benefit of the criminal enterprise by the criminal enterprise, which was in existence prior to the inception of the Ponzi scheme. That's expressly stated in the complaint. Okay, and that's where we get to your point about conclusory allegations. Where is there anything to suggest, in the way of factual information, that what you perceive to be a contract violation is indeed also in furtherance of a criminal act? Okay, well, in the complaint, I recite that the dissemination by the title insurers of the misstating exchange agreements through the mails and wires was a predicate act. And that applies to the six years as well as to the nine years. And that brings me kind of back to what I want to get on the record, which is this internal conflict between the way the trial court treated the six-year period and the nine-month period. And that is this. The trial court, based on the four corners of the exchange agreement, which stated that the bankruptcy test cases, which analyzed based on the four corners whether exchange funds were held in trust or whether they were assets of the bankruptcy estate, not whether anybody had been misled, held that the term unrestricted meant that there could be no pattern of racketeering for the six-year period because Land America was authorized to use exchange funds as it saw fit without regard to whether anybody had been misled or not. That title had passed, had it not? Pardon me? Had title not passed to Land Exchange at that time under 2C of the agreement? Yeah, but nobody would sign the agreement if they were told, number one, your exchange funds are going to be invested for Land America's benefit, or number two, your exchange funds are going to be invested to cover the prior losses that resulted from the investments we didn't tell the earlier exchangers about. Judge Fisher found that the agreement was clearly unambiguous in stating these terms, such that subjective intentions really were no matter to us. I agree. And that's where she relied too heavily on the test cases because she effectively said this. It didn't matter whether anybody had been misled because for the six years, Land America could do what it wanted with the investment funds, and if that's true, then this court should rule that the nine-month Ponzi scheme doesn't matter either. I didn't really understand her to say it doesn't matter if people are misled. I understood her to say a reasonable person really shouldn't be misled because the language was abundantly clear. It was in fact the case that the exchange agreement says in unmistakable terms, as she described it, that you're giving everything over to them, and they're going to do with it what they're going to do with it. And that's the deal you struck. You could have chosen a different kind of vehicle to engage in this 1031 exchange. This is like right at the start of her opinion. There were four ways to do this. You pick the qualified intermediary, the exchange agreement said. You give the money to us, and we do with it what's ours to do with it, what we're going to do with it. And you knew that, and indeed the IRC, the Internal Revenue Code, required that, and everybody knew that going in. I understand that to be the arc of her argument. Where's the flaw in that argument? Assuming that is her argument, her reasoning, where's the flaw in it? Who would ever sign that exchange agreement without being misled? Well, your client did, and so did thousands of others, as you pointed out. They read it. They understand. I'm giving the money to them, and I need to do that because I can't have any control over it or I lose the benefit of the tax deferral I'm looking for. So I have to be hands-off. They have to have full control. That's the understanding. It's driven by the code, and everybody knew it walking in. That's how I understand her to be reasoning through this process. So when you say, who would sign that? The answer is people like your client who wanted a qualified intermediary to handle the money so that they could get tax deferral. Isn't that the end point of the discussion by her reasoning? Wasn't there also a provision for those who wanted their money put into a separate account that they could do that, they could opt for that? That is correct. You did have the option if it was disclosed to exchangers, although the evidence indicated it wasn't disclosed to exchangers. But the evidence in front of the court indicates that my client was actually asking for that and told he received that and did not get that. And where in the record do we find that? During the break, I can lift up the facts, but I did address it in the briefing. And assuming that were true, that fell within that nine-and-a-half-month period, right? Correct. Okay. Well, you reserved a good chunk of your time, your five minutes, so we'll have you back on rebuttal, Mr. Denver. Thank you. Ms. Calderas. May it please the Court, good morning. I'm Erica Calderas on behalf of the Defendants' Appellees, Fidelity National Title Insurance Company, and Commonwealth Land Title Insurance Company. This appeal on a summary judgment is a little bit unique in that it's really not very fact-intensive. We have presented the court with five independent legal grounds on which they can affirm the district court's decision. You can choose to affirm on the ground that the district court decided, the lack of continuity, or any of four additional grounds, which I'm happy to discuss. Why don't we stick with what the district court did? But you're going to need to argue and address what I take your plaintiff's main argument to be. There's more than nine-and-a-half months ago. There's more than that February to November period involved here, and the district court didn't give that adequate place. So in particular, if you would, answer why what's in the second-minute complaint is not sufficient to understand what the plaintiff was saying as, hey, this was a long scheme that involved misleading people over a period of time. It came to a head in that February to November timeframe, but the setup was going on for years. Yes, and I think you stated it very clearly during Mr. Denver's argument, the second-minute complaint. I'm just asking questions. I'm not stating anything. No, no. You stated that within the second-minute complaint, there's certainly discussion of acts prior to the nine-and-a-half period, but they are presented in the context of background to understand the plaintiff's transaction. And when you read the second-minute complaint, and this is RICO, we ask plaintiffs to plead RICO very specifically and to put on a RICO case statement because all the parties need to understand very clearly what's being alleged. RICO is hard to allege, and we want to make sure that it's being alleged properly. So in the second-minute complaint, there are numerous, numerous references to the nine-and-a-half period, and there's never a single reference to that nine-and-a-half period of racketeering being any longer. And in the RICO case statement, very specifically, the plaintiff is asked to identify the pattern of racketeering and identifies only predicate acts within a nine-and-a-half-month period. So there are no other allegations as a first point, and we contend that those, you know, a RICO case statement is a pleading, and we contend that those are binding admissions on the plaintiffs. Is there a factual problem that arises and at least raises an issue to defeat summary judgment when we look in the exhibits here and find, for example, on page 664 of the appendix, this email exchange between the general counsel of LES and bankers, attribute this kind of comment to the general counsel. You recently have stated in writing that the money used to purchase the securities in LES's safekeeping account was money held in escrow as a fiduciary on behalf of LES's customers. And then going on and saying things like, you suggested that LES may have violated its fiduciary duty or otherwise acted improperly with respect to its customers. I mean, these are statements about what the general counsel said. She disputes that in an exchange, but is that evidence from which a reasonable fact finder presented with it could say there was lying, there was misleading, they were telling people they were fiduciaries, and then they were doing other stuff with that money for their own benefit. Does that create fact issues that should have gone beyond summary judgment? It does not, Your Honor, because it does not go to extend the period of continuity for the pattern of racketeering. That evidence and other evidence was considered by the bankruptcy court when they made their decision that the money was not being held in escrow. It was not being held in a fiduciary capacity. Well, now you're on to res judicata, and I don't want to get on to res judicata right now. Stick with me on whether this district court in this context was obligated to look at that information and say maybe these people were being misled and this was some kind of setup. What do you say to that? So I didn't mean to address it in the context of res judicata. It goes to Judge Fischer's analysis of the evidence and the prior test case decisions concerning the exchange contracts, and in those test cases concerning the exchange contracts, they did consider that subjective intent, regardless of whether some individual at the exchange company thought they were holding the money as an escrow. It just wasn't the case, and that was decided. What I understand the argument from your opponent to be is, yeah, the district judge focused on what the bankruptcy court said but missed the point that we're trying to make, German autos are trying to make, which is there was lying going on. There was misleading going on, active misleading. And here's proof of active misleading that the general counsel herself acknowledged it in conversation with the bankers. Now, a jury could look at that and say, we don't believe it, we believe her. She denied saying it, but there's evidence of it. We should get to put that on, and that was going on before the nine-and-a-half-month period. This was stuff that they were doing with their customers to draw them in as a way of getting advantage of their money, and it's all part and parcel of a nefarious scheme. That's what I take them to be saying. What's the answer? So if you accept that and you delve into that evidence, then you're allowing a collateral attack on the bankruptcy court decisions, which have already considered the subjective intent of the general counsel and rejected it. So now you're on to collateral estoppel. No. That's what it sounds like. It sounds like you're saying you can't think about that because the bankruptcy court already decided, so don't think about it. No, Judge Fisher dealt with their attempt to say that the bankruptcy court was defrauded and didn't have all the evidence before it, and she determined that, in fact, they did have the evidence. What are you saying if you're not saying, hey, she was wrong to look at it and you're wrong to look at it, if you're not saying the issue is closed because it was litigated? If you're not making a collateral estoppel argument, what are you making? If you want to consider it, collateral estoppel or a rate judicata, that's certainly one thing. I don't want to. What's your argument? I'm arguing that that evidence has already been considered and the contracts have been construed as a matter of law. By whom? By the bankruptcy court. Not by the district court? Did she simply defer? Correct. If you were to allow that to be attacked, then you could end up with an inconsistent decision here that's contrary to the bankruptcy plan, to everything that happened in the bankruptcy cases, to all of the distributions that have already happened, to the $950,000 distribution that's already happened to plaintiffs. That sure sounds like collateral estoppel. I'm willing to assert it as collateral estoppel because rate judicata is one of our independent grounds. Tell us about the state of the plan now. Is it complete? Where are we in that? The plan is complete. Okay. And if the plan is complete, then how is it that anything that could happen now in the way of a lawsuit could disturb the plan? So far as odd, the rate judicata case that we cite from the Southern District of New York explains that. When a plan is made in bankruptcy, it considers all of the happenings in the bankruptcy court, the claims that are presented, it comes up with a plan, and that is confirmed. And if you allow a claim later to come in that was precluded by the plan, then the plan would have been stated differently. So the fact that the plan has been completed and the money paid out doesn't make it any less capable of having been impaired by this RICO claim. If this RICO claim had been alleged in the bankruptcy court, the plan would have been prepared entirely differently. And we have to remember also that in the bankruptcy court, the plaintiffs sought their lost opportunity damages that they're seeking here, and they were disallowed as speculative, and the court said the bankruptcy plan is raised judicata to that. Counsel for the plaintiff points to a section of the plan that allows actions to continue. Correct. So there were certain enjoined actions and then certain non-enjoined actions, more specifically the SEC claims. This RICO claim does not fall within an exception to the plan. Even if an action wasn't technically an enjoined action, then it still couldn't be a claim that would impair the plan. And Farzad teaches us that a RICO claim alleging a Ponzi scheme against my clients is a claim that would impair the plan. Do you think there's anything in Judge Fisher's opinion that indicates that she, in conducting her summary judgment analysis, arrived at her conclusions with respect to the exchange agreement on her own without being entirely relying upon the bankruptcy court's decision in Frontier Pepper? Yeah, I was actually quite surprised. We presented her with such a straightforward continuity argument. I was actually surprised that she put in the effort to analyze the facts about the time period prior to and to look at the counsel's testimony that gave advice to the general counsel and to say, you know, this evidence here shows that any subjective intent with regard to the construction of the contracts was nearly that, subjective intent, and it was not expressed in the party's agreement, which, you know, is what we have to take as their agreement. Did the bankruptcy court's opinions in Miller and Frontier actually set aside the idea of potential for constructive trust in the event there was a finding of fraud? You know, I don't recall what they did with respect to that, but they very clearly made the determination that there was no requirement to hold the funds and plaintiffs. They were talking in that context about, as Judge Mariani pointed out, there was a judgment that the title was in the bankruptcy estate and that the contract was clear on that, but I thought that there was some specific reservation by the bankruptcy court in saying, we're not talking about constructive trust here, and whether or not exchange funds might have been acquired by fraud or improper means. Am I wrong about that? So that may be the case. I don't remember that detail, but what I do remember from those test cases is that the court very, very clearly said that the money was not to be held in a bank and that it was permitted to be used in any way that the exchange companies saw fit. Well, not that it wasn't to be held in a bank, but that they could do with it what they wanted, right? Correct. But plaintiffs' theory about the six-year period prior is that it was required to be held in a bank. You've got to give them a little bit of a break for that, right? Because doesn't paragraph 3A say, LES will deposit the exchange funds in an account maintained at SunTrust Bank in Richmond, Virginia? It doesn't say they have to stay there. And, in fact, the plaintiffs' It doesn't, but most people, when they hear, deposit the exchange funds in an account maintained at SunTrust in Richmond, might be forgiven, might they not, for thinking, well, that means that's where my money will be. You have to also construe it in conjunction with the other clause in the plaintiff's contract, which said investments, you'll earn this much on the investment of the funds. So that clearly disclosed to the plaintiffs that the money was going to be invested. So that, in conjunction with the 1031 rules, that you're not allowed to have any control over the money, I think it was pretty clear that the contract that was made was that they were divesting themselves of the money. Okay. I think that's it. You're essentially restating what's in 2C, are you not? 2C of the exchange agreement. 2C of the agreement. If that's the paragraph, Your Honor, I'm sorry, I don't recall the specifics. Any questions on any of the other grounds? No, thank you. Statute of limitations is actually my favorite. Yes, well, we got your papers and full briefing. Thanks, Ms. Calderon. And only because American pipe tolling was the first issue I ever worked on as a new attorney, so that's why I say that. Okay, thank you. Thank you. Mr. Denver, your rebuttal, please. Thank you, Your Honors. Just to respond to your question about whether constructive trust had been involved at all. No, it wasn't. The only issues considered was express trust and implied trust. Whether anybody was tricked wasn't an issue. It was whether these were assets of the estate to be distributed or not. That's it. Can you meet your opponent's argument here at the podium that RICO statements are required precisely so that everybody is on clear notice of exactly what is being alleged as the scheme and that you made statements about that, that German honors made statements about that in the filings and should be held to it? Yeah, I think that the rule, I can't remember, I think it's 17.1, the rule is state the facts supporting the RICO allegation when the case was filed. This case was filed originally in Santa Barbara, California in state court. It was moved to the Central District in Los Angeles. It was transferred out here. With all due respect, I believe in my heart that defrauding thousands of people, even if it's less than 365 days, qualifies as RICO, but I don't want to get into that because I don't think that's an issue that I can win here today. But I do, I'm sorry. And I think that's wise because we've got binding precedent, right? This is a panel. We've got our Third Circuit precedent. It is what it is. So I think you're right not to be arguing about the time limit part, that is whether 365 should be a bright line rule. But go ahead. You're about to explain why it's not just 365. Yeah, I mean, okay. I mean, I mentioned the Liberty Bell case. It's not binding. It's under internal operating rule, I think, 5.7. I think that's what it is. But it is instructive and it is this court articulating when one fraudulent set of acts arises out of another, you look at them both because it's the whole picture. We don't isolate it. The title insurers deserve no benefit from the fact that they ran out of money before 365 days. The Ponzi scheme would have continued indefinitely into the future if they had been able to do so. And there's testimony in the record on that point. When you say they deserve no benefit, there is case law that says if the enterprise ceases to exist and operate, that makes it a closed-ended scheme. I agree with that. I agree that that is what some of the— Well, then they do get, quote, some benefit, I quote, which is we're dealing with a fixed endpoint by historical fact, right? Okay. And doesn't that—I mean, so the counterfactual that would still be going on just doesn't add anything, does it? Yeah, I mean, I've only got two minutes, and I don't want to waste my time on that. Because I don't see it as a fight I can win here today. That's all I mean by that. One quick question for you. Tell us, what was the fraud in the six-year period about which you know— Okay, the fraud was this. The German ROs who invested in 2003 received in the mail, and this is all borne out in discovery. Facts are undisputed. This is beyond—there's no contention here about whether what I am saying happened happened. They received in the mail from the title insurance company the exchange agreement, which indicated to them that the money would be held in a bank. That was confirmed with the title insurance company directly by Joe Germinal and also through his lawyer, Mr. Marsotti. What does it mean in that exchange agreement that there are specific references about investment and in our sole discretion and we've got complete control of those sorts of things? All of that language is statutory to comply with 1031. But the promise—with all due respect, the promise that the money will remain in a bank account and your interest will be generated off of the FDIC-insured interest means the money's going to stay in a bank. Yeah, that's the important thing. You just put the rabbit in the hat when you said it will remain in a bank. Where does it say that? Because it says until the date of withdrawal. It's— It will earn interest until the date of withdrawal. That's what it says. You didn't say it will remain in the bank account until the date of withdrawal. Well, how could it earn bank interest if it's withdrawn before that? How could it earn interest if it's sitting in the bank account doing nothing? It earns bank interest. Right, there's—I guess the difficulty is when you say until the date of withdrawal, doesn't that, in fact, presume withdrawal? Not withdrawal on your timeline, not withdrawal for your benefit, but it's going into a bank, it's going to get withdrawn. We're talking about investments. Now, with all due respect, the exchange agreement says the exchange funds. It's a defined term, and it means the money the exchanger deposits. The exchange funds will be used to purchase your replacement property. Okay. And it will earn interest until the date of withdrawal. Now we're back into collateral estoppeling, right? No, no, no. No, we're not. I lost— This only works if you let me ask a question. I'm just passionate about it. Isn't it, in fact, the case that the bankruptcy court, in the test cases, looked at this very issue, who's got control, who's entitled to have control, where does it have to stay, and, in fact, said, no, the record is clear here. They could do with that money what they wanted to at LES. Isn't that what it says? That's what it says, and I don't have any issue with that in terms of a trust law analysis. But when we're talking about was somebody deceived, that's a whole different ballgame. There is no res divicata. There is no collateral estoppel. The review here is plenary. It doesn't really matter what the bankruptcy court says. It doesn't really matter what the trial court says. The question for this court is, have you done enough to generate a question of fact for a jury? Here's my problem, Mr. Denver. If you say that the bankruptcy court, and you acknowledge the bankruptcy court, said this contract is clear, it clearly gave the LES folks the power to do with those funds what they chose to, how can you then say that says nothing about misleading? Because how can you be misled if you read something that's clear? No, what I'm saying is this. Maybe I didn't say it clear enough. I think I did in the papers. But what I'm saying is this. The trust law analysis doesn't really have anything to do with what's happening here today. So there is no collateral estoppel or res divicata. What I'm saying is the language in the exchange agreement, number one, complied with the statute, which is what the bankruptcy court was concerned with. Did it give complete control or were these assets held in trust? It did that. But then it also indicated very clearly in all the evidence in the record, which is undisputed, indicated that the money would sit in a bank account. Because these exchangers were not investing in land America. They were not trying to reap a profit. They were trying to tuck their money away safely so they could buy that next property. Understood. Gotcha. Can I make one last point? You sure can. No, you can. You've come a long way. Go ahead. Okay, so going to the actual language of the complaint, paragraph 137, at the direction of senior management, the title insurers committed fraud by, among other things, printing and distributing the plaintiffs' exchange documents. It just goes through the fact that the title insurers were the ones disseminating these documents at all relevant times in the complaint, which encompasses the six years. The evidence in the record, which I mentioned, is undisputed and supports that. The German auto has, in fact, received an exchange agreement in 2003 and 2008 from the title insurers. There's no dispute there. Paragraph 152, the conduct of the affairs of the business of the enterprise affecting interstate commerce through the described pattern of racketeering activity. Number 155, the success of the scheme was dependent upon the ability to mislead clients regarding the safekeeping and use of clients' exchange funds or clients would not do business with LES. 157, at all times here and mentioned, the Land America entities operated as an enterprise as defined in 18 U.S.C. 1961. So there are allegations that wrap up the factual allegations from the six years of deception within the cause of action. All right. Thank you very much, Mr. Denver, and thank you, Ms. Calderas. We appreciate you being here for our argument today. We've got the matter under advisement, and since this has been delayed, we'll endeavor to get you a decision promptly. Thank you, Mr. Connors. Thank you. For any reason. All right. Of course, he is adjourned until today at 1130.